**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**


ALYSSA CARTON,

       Plaintiff,

v.                                          CIV 17-0037 KG/SCY

CARROLL VENTURES, INC.,

       Defendant.


## PROPOSED FINDINGS OF FACT AND RECOMMENDED DISPOSITION

**THIS MATTER** came before me on Chief United States District Judge M. Christina Armijo's Order of Reference referring this matter to me to conduct hearings, if warranted, including evidentiary hearings, and to perform any legal analysis required to recommend to the Court "an ultimate ruling on this matter in order to determine whether the actions [filed by Plaintiff] are frivolous or malicious." *See* Doc. 20. The Court has heard the testimony of Plaintiff and the statements of her counsel, the arguments of attorneys for some of the Defendants in these actions joined for this purpose, and has given due consideration to the exhibits submitted in this earliest-filed case and the relevant law. The Court will recommend that Chief Judge Armijo find all of Ms. Carton's Complaints to be malicious and that she dismiss them with prejudice.

### Background

Plaintiff Alyssa Carton suffers from spina bifida and requires the use of a wheelchair. Her attorney, Sharon Pomeranz, filed 99 cases on her behalf earlier this

year.  The Complaints allege that each Defendant owns and/or operates a place of public accommodation ("PPA") which violates the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12181 *et seq.*, and related regulations.  The Complaints are identical except for the names of the Defendants, the addresses of Defendants' PPAs, and the specific alleged ADA violations at each PPA.

Ms. Carton asserts claims in two capacities. The first capacity alleged is as a customer of each Defendant, stating she has "personally visited each Defendant's PPA, but was denied full and equal access and full and equal enjoyment of the facilities, services, goods and amenities." Complaint ¶¶ 8-9 at 2-3.  The second is as a "tester." Complaint ¶ 11 at 3 ("Completely independent of Plaintiff's personal desire to access the PPA, Plaintiff also acted as a tester for purposes of discovering, encountering, and engaging discrimination against persons with disabilities at [each] Defendant's PPA.").

Plaintiff is proceeding *in forma pauperis*  ("IFP") in all but two of those cases.[1] The statute governing proceedings *in forma pauperis* states: "Notwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case at any time if the court determines that . . . the action . . . is frivolous or malicious." 28 U.S.C. § 1915(e)(2).  Therefore, on May 1, 2017, this Court held a hearing to determine whether Plaintiff's cases are frivolous or malicious. Contrary to the Court's Order setting the hearing, Ms. Carton did not attend. However, Attorney Pomeranz did answer questions from the Court and from defense counsel. The Court held a second hearing on May 11, 2017, at which Ms. Carton and Attorney Pomeranz both answered questions from the Court and from some of the defense counsel.

---

[1] The Court found that based upon her filed affidavit, Ms. Carton could afford to pay the filing fee in two cases and therefore denied Plaintiff's IFP motions in Carton v. Carroll Ventures, Inc. (01:17-cv-00037-KK-SCY) and in Carton v. Aryavart, Inc. (1:17-cv-00210-SCY-WPL).

## Legal Standard

Pursuant to the statute governing *in forma pauperis* status, "the court shall dismiss the case [proceeding IFP] at any time if the court determines that . . . the action . . . is frivolous or malicious." 28 U.S.C. § 1915(e)(2)(B). "A complaint is frivolous if 'it lacks an arguable basis either in law or in fact.'" *Fogle v. Infante*, 595 F. App'x 807, 809 (10th Cir. 2014) (quoting *Neitzke v. Williams,* 490 U.S. 319, 325 (1989)).

> Dismissal as malicious is appropriate if the court determines that the action was filed in "an attempt to vex, injure or harass the defendant." *Deutsch v. United States*, 67 F.3d 1080, 1086 (3d Cir.1995); *see Lindell v. McCallum*, 352 F.3d 1107, 1109 (7th Cir. 2003) (although "'malicious' . . . is sometimes treated as a synonym for 'frivolous,' . . . [it] is more usefully construed as intended to harass"). To make this determination, the court "must . . . engage in a subjective inquiry into the litigant's motivations at the time of the filing of the lawsuit." *Deutsch*, 67 F.3d at 1086. An action may be adjudged malicious if it "is plainly abusive of the judicial process." *Abdul–Akbar v. Dep't of Corr.*, 910 F. Supp. 986, 999 (D. Del. 1995), aff'd, 111 F.3d 125 (3d Cir. 1997) (unpublished). And "repetitious litigation of virtually identical causes of action" supports a finding of malice. *McWilliams v. Colorado*, 121 F.3d 573, 574 (10th Cir. 1997) (internal quotation marks omitted).

*Rosiere v. United States*, 673 F. App'x 834 (10th Cir. 2016); *see also* Black's Law Dictionary 1101 (10th ed. 2014) ("Malicious" means "substantially certain to cause injury" or "without just cause or excuse"); *Hernandez v. Earney*, 558 F. Supp. 1256 (W.D. Tex. 1983) (complaint that demonstrated that purpose of action was extortion was "malicious"); *Green v. Jenkins*, 80 F.R.D. 686 (W.D. Mo. 1978) (actions initiated in bad faith for purposes of harassment found malicious); *Spencer v. Rhodes*, 656 F. Supp. 458 (E.D.N.C. 1987) (in determining whether a *pro se* complaint should be dismissed as malicious, judge may consider not only printed words, but "circumstances and history that surround the filing, the tone of the allegations, and whether probative facts vital to life of lawsuit have been alleged.").

## Discussion

### I. An Introduction to Plaintiff, her Attorney and the Litigation Support Company

Although not disclosed in her Complaints or IFP Affidavit, Plaintiff Alyssa Carton filed these cases with the assistance of not only her attorney, Sharon Pomeranz, but also a litigation funding entity. Just how and why these actions were filed was explored during the two hearings held in 2017 on May 1 (1st Hearing) and May 11 (2nd Hearing).

#### A. Ms. Carton's Version of Events

Interested in advocacy, Ms. Carton wanted to find things to do to benefit her community of people with disabilities, and so in the fall of 2016, she responded to an ad that had been posted on Craigslist. *Transcript* – 2nd Hrg at 12:02-17 *(Doc. 35* in 17cv00037). Ms. Carton called the phone number listed in the ad and spoke to someone who indicated that "they were there and available to help" and to "provide litigation support." *Transcript* – 2nd Hrg at 30:05-07. Ms. Carton referred to this group as "the Litigation Management Company." *Transcript* – 2nd Hrg at 36:06-07.[2] According to Ms. Carton, the group "basically introduced me to Ms. Pomeranz." *Transcript* – 2nd Hrg at 30:08-16, 36:08-10. Ms. Carton testified that her "assumption is they all worked together." *Transcript* – 2nd Hrg at 37:02.

The organization that purportedly placed the ad on Craigslist and entered into a litigation funding agreement with Ms. Carton is an entity known as Litigation Management and Financial Services, LLC ("LMFS"). It appears, however, that LMFS is somehow affiliated with another organization, Advocates for Individuals with Disabilities Foundation ("AID"). Specifically , Ms. Carton received both the "Litigation Funding

---

[2] At the first hearing, Attorney Pomeranz also referred to the group as the Litigation Management Company. *Transcript* – 1st Hrg at 39:17-18.

Agreement" that she executed and the IFP application form that she filled out in an e-mail from Emily@aid.org sent November 1, 2016. *Doc. 34* at 4-14 ("Attached is the paperwork that I will need filled out for us to begin filing cases."). Apparently, the same individual later re-sent the agreement to Ms. Carton on April 21, 2017, but this time with a return e-mail address of Emily@litmanco.com. *Doc. 34* at 3 ("Here is that agreement again for your records:] Craig just got out of his meeting so we will call you in just a second."). The Litigation Funding Agreement between LMFS and Ms. Carton is attached as Exhibit A to this PF&RD.

### B. Attorney Pomeranz' Version of Events

At the first hearing, Attorney Pomeranz implied that Ms. Carton was not referred to her by any outside entity such as a litigation funding group:

> THE COURT: Are you, as an officer of the Court, indicating to me that Ms. Carton came to you on her own to file these lawsuits?
> MS. SHARON POMERANZ: Ms. Carton contacted me, yes.
> THE COURT: On her own?
> MS. SHARON POMERANZ: **She contacted me on her own.**
> THE COURT: Did she say how she had gotten your name?
> MS. SHARON POMERANZ: She said she got my name through Google.

*Transcript* – 1st Hrg at 38:19-25, 39:01-05 (emphasis added). Attorney Pomeranz declared that it was after meeting with Ms. Carton that they **_then_** "contacted a group that specializes in this work" named "Litigation Management Company." *Transcript* – 1st Hrg at 39:06-18 (emphasis added). She flatly denied that this "non-profit" group in Arizona is the controversial "AID" organization that filed over 1,000 ADA cases in Arizona last year. *Transcript* – 1st Hrg at 39:10-18 ("They are not AID."). In fact, the company's name is Litigation Management and Financial Services, LLC ("LMFS").

Attorney Pomeranz expressly disclaimed a connection with any ADA advocacy

group at the first hearing:

> I don't work in the ADA industry. I have never filed ADA cases before. I was contacted by one client. It seemed like she had very legitimate cases. I agreed to represent her. I'm not in the industry. I do family law, Judge. . . . *I have never done ADA work before, and I'm not affiliated with any groups or trying to do impact litigation.*

*Transcript* – 1st Hrg at 47:05-09, 57:10-12 (emphasis added). She further claimed that she 'had no basis to know if [Ms. Carton] was working with an outside group or not."

*Transcript* – 1st Hrg at 54:13-20. Attorney Pomeranz insisted:

> I have been completely honest with the Court about my representation of her. *It was an agreement between she and I (sic) to enforce the ADA, and that's the extent of it. There's no cottage industry. There's no outside influence.* And, you know, this idea that, you know, there's some industry springing up all over the country has nothing to do with me or Ms. Carton. That may or may not be true, and there may be groups out there planning to enforce the ADA. But that's outside the scope of this proceeding.

*Transcript* – 1st Hrg at 56:04-16 (emphasis added).

At the second hearing, however, Attorney Pomeranz did an "about face" and revealed that as to the ADA cases brought here, she indeed had a confidential "litigation funding agreement" with a previously undisclosed entity – LMFS. Attorney Pomeranz indicated that she first connected with LMFS during the summer of 2016 when she "answered an ad for civil rights attorneys on Indeed." *Transcript* – 2nd Hrg at 101:09-16. The Court notes that "Indeed.com" is a website which touts itself as "the world's #1 job site." https://www.indeed.com/about (last visited July 5, 2017). Attorney Pomeranz said she answered LMFS's "ad prior to meeting Ms. Carton . . . but [she] didn't sign [her] agreements with them until after meeting Ms. Carton." *Transcript* – 2nd Hrg at 143:19-22. Attorney Pomeranz stated that LMFS was responsible for "paying the filing fees, and they were providing staff, and they paid her the money to reimburse her for any

litigation expenses." *Transcript* – 2nd Hrg at 80:10-20. Among the resources provided by

LMFS was Attorney Pomeranz' new e-mail address – [Sharon@newmexicoada.com](mailto:Sharon@newmexicoada.com) –

and website proclaiming, as of the date of the first hearing, "extensive knowledge" and

"experience of over 1,000 ADA Title III cases." *Transcript* – 1st Hrg at 57:19-22 and 2nd

Hrg at 70:01-07; [http://newmexicoada.com](http://newmexicoada.com) (viewed May 1, 2017). It should be noted

that those representations have since been removed from the website.

## II. The Three Contractual Agreements

### A. "Litigation Funding Agreement" Between Ms. Carton and LMFS

The Litigation Funding Agreement entered into November 1, 2016, between Ms.

Carton and LMFS, provides in relevant part:

> This Agreement is limited to providing funding to [Ms. Carton] and to
> [Ms. Carton's] attorney for legal services. . . . the Parties have agreed
> that [LMFS] shall bear the costs so that [Ms. Carton] may pursue the
> Claims.
> . . . .
> [LMFS] shall pay the costs of pursuing the Claims including costs of
> legal advice and representation, court fees . . . .
> . . . .
> ***[LMFS] shall pay to [Ms. Carton] $50.00 for each of [Ms. Carton's
> claims that result in a filed complaint initiating a civil action.***
> . . . .
> [Ms. Carton] shall be entitled to all remaining Proceeds [of any
> successful claims].
> . . . .
> [Ms. Carton] affirms that it has had full and lengthy opportunity to
> discuss with [LMFS] the options for and likelihood of settlement of
> Claims. . . . ***[Ms. Carton] therefore gives [LMFS] full and complete
> authorization to negotiate and accept any settlements of Claim.***
> [Ms. Carton] agrees to cooperate and consent to any settlement
> deemed reasonably [sic] by [LMFS].

*Attachment A* – Notice and Order, Doc. 37 at Exhibit 1, filed May 17, 2017 (emphasis

added).

## B. "Fee Agreement" Between Ms. Carton and Attorney Pomeranz

A little over two weeks later, on November 17, 2016, Ms. Carton also entered into an agreement for attorney representation with Attorney Pomeranz, which is Attachment B to this PF&RD. That entitled "FEE AGREEMENT" between Ms. Carton and her attorney provides in pertinent part as follows:

> Attorney [Pomeranz] agrees to abide by Client's [Ms. Carton] decisions regarding the objectives of the representation, and shall consult with Client [Ms. Carton] as to the means by which they are pursued. . . .
>
> The fee of Attorney for representing Client is $100.00 per case filed on behalf of Client. Client authorizes payment to Attorney by third-party litigation management support company ("LMSC"). . . .
>
> Costs and expenses incurred by Attorney in its representation of Client are covered by the attorney unless otherwise agreed upon with Client. Client agrees that LMSC may cover some or all of attorney's costs and expenses. Costs and expenses include, but are not limited to, fees for expert witnesses, filing fees, fees for service of process, deposition costs, travel expenses, investigators' fees and expenses, copying charges, long distance telephone charges, messenger service fees, and Westlaw/ Lexis Nexis legal research charges.. . . .
>
> Attorney may retain support staff and support companies including the Company as a third-party LMSC. The retention of any LMSC shall not change the fee owed to Attorney by Client or the duties owed to Client by Attorney.
>
> LMSC is anticipated to provide attorney with litigation support including, but not limited to, initial drafting of legal filings, managing correspondence from opposing counsel/parties, and facilitating settlement discussions as directed by Attorney and with final authorization by Client. Attorney will provide LMSC authority to present settlement offers to opposing counsel/parties.
>
> Additional Compensation and Client Waiver of Monetary Recovery
> In the event that Client's case(s) result in a judicial award or settlement payment ("Monetary Recovery"), ***Attorney shall receive an amount equal to one-hundred percent (100%) of the Monetary Recovery*** if effected by settlement before or after service of suit, with or without trial or if said monetary recovery is an award of the Court.

*Attachment B* – Doc. 38, filed May 19, 2017 (emphasis added).

### C. "Litigation Management Agreement" Between Pomeranz and LMFS

The undated, executed Agreement between Attorney Pomeranz and Alex Callan, an agent for LMFS, for the provision of "management services to Attorney only in ADA Actions filed by Attorney on behalf of Testers" states in part:

> [Pomeranz] is retaining [LMFS] to provide **all** litigation support services within the broadest scope of ethical rules governing the practice of law. The litigation support includes [LMFS] providing receptionist, telephone, e-mail, paralegal and consulting services by [LMFS] attorneys knowledgeable and experienced in ADA enforcement actions. . . . [Pomeranz] directs [LMFS] to provide services described in this Agreement. . . . [LMFS] shall assign paralegals, staff and personnel to work for [Pomeranz]. . . .
>
> [LMFS], under the supervision, authority and consent of [Pomeranz], shall manage all aspects of ADA civil actions. . . .
>
> [LMFS] shall . . . Contact [Carton] directly for the purpose of preparing and submitting Motion to Proceed in Forma Pauperis pursuant to 28 U.S.C. § 1915 and to complete the Affidavit . . . . prepare a draft Verified Complaint [and] file the same with the U.S. District Court; and Pay the filing fee unless waived.

*Attachment C* – Notice and Order, Doc. 37 at Exhibit 2, filed May 17, 2017 (emphasis added).

### III. Identification of ADA Violations

There appear to be inconsistencies between the allegations in the Complaints and Ms. Carton's testimony regarding the identification of alleged ADA violations. Among them, the filed Complaints allege that Ms. Carton personally visited Defendants' PPAs and encountered barriers to access at each PPA.  *See* Complaint ¶ 8 ("Plaintiff personally visited Defendant's PPA, but was denied full and equal access"), ¶ 9 (Plaintiff "visited Defendant's PPA"), ¶ 11 (Plaintiff "visited the Premises, encountered barriers to access"), ¶¶ 30-31 ("Plaintiff visited Defendant's PPA. . . . Plaintiff was prevented from

the full and equal enjoyment" of Defendant's PPA).

However, Ms. Carton testified that she did not enter all of the PPAs:  "I entered most of them.  I think there is several that we – that were just parking lot situations. . . so most of them, yes, I would say I was there in the building.  But there's several that we just filed for the parking lot."  *Transcript* – 2nd Hrg at 23:01-06.  Ms. Carton also testified that for some of the businesses, she did not go into the building and did not know whether there were any actual barriers to entering the building.  *See Transcript* – 2nd Hrg at 126:02-11.  In some cases, she testified that there were no barriers to her entering a PPA.  *See Transcript* – 2nd Hrg at 55:05-08 (nothing ever kept Plaintiff from entering Buffett's Candies) and 59:11-14 (Plaintiff doesn't recall experiencing any barriers at Office Depot).

The Complaints also allege that "Plaintiff in her individual capacity and as a tester, visited the Premises, encountered barriers to access at the PPA, engaged and tested those barriers."  Complaint ¶ 11.  "Engaged and tested" suggests that Ms. Carton encountered and measured alleged barriers, such as the height of soap and towel dispensers and aisle width.  However, Ms. Carton testified that generally her driver would visit the PPA, take the measurements, and then later take Ms. Carton to the PPA to "observe" violations and sometimes photograph her at the location to document her physical presence at the location. *See Transcript* – 2nd Hrg at 24:02-05 (Ms. Carton "took a few [measurements], but not a lot"), 50:13–53:10 (Ms. Carton doesn't think she was at Office Depot when driver took the measurements, but didn't remember, "there were days where [the driver would] go and measure things first, and then I'd go back . . . [to] make sure that the violations were there").

## IV. Preparation of the Complaints

Attorney Pomeranz claims that she was the individual who drafted an ADA complaint that was then used as a "boilerplate for the rest." *Transcript* – 1st Hrg at 34:23-24; *Transcript* – 2nd Hrg at 70:19-22. Indeed, she says that she "started drafting the complaint[s] before [Ms. Carton] had experienced **any** barriers at any business[es] in Albuquerque." *Transcript* – 2nd Hrg at 76:10-13 (emphasis added). Attorney Pomeranz explained:

> We were preparing for litigation for the – well, she had **already** told me, when I met her at her house, all the barriers she faced every day. . . . We just drafted a general ADA Title III complaint. We didn't have, as you say, a Carroll Ventures yet because [Ms. Carton] hadn't visited any – she hadn't experienced barriers at any particular defendant.

*Transcript* – 2nd Hrg at 76:22-25 (emphasis added). Yet Attorney Pomeranz also maintained that she "started drafting the complaint[s] in August [2016]," which was long before she knew of Ms. Carton and long before her client experienced any alleged barriers to services. *Transcript* – 2nd Hrg at 77:05-09. Ms. Pomeranz also claims that she gave this generic ADA complaint to LMFS and contends that this explains the virtually identical complaints filed in the Districts of Nevada and Colorado by attorneys with similar "litigation funding agreements" with LMFS. *Transcript* – 2nd Hrg at 70:23-25 –71:01-19, and 72:11-14 ("we developed one template, and we used it for all of the rest, and that that is the same model they must have been using in their other litigation support efforts.").

The Court finds Attorney Pomeranz' claim of composing the Complaints at issue to be unconvincing for several reasons. As she acknowledges, she had virtually no experience in this area of litigation. She further contends that she began drafting the

complaint in August 2016, but says she had no contractual relationship with LMFS until after she met with Ms. Carton in late 2016. Moreover, it was the expert in this area – LMFS – that contractually had undertaken the obligation to draft any ADA complaints that Attorney Pomeranz would file. Finally, despite her assertion that she had drafted the allegations of all the complaints, Attorney Pomeranz stated that "this allegation that she's a tester is another reason that I feel uncomfortable continuing with my representation of her." *Transcript* – 1st Hrg at 14:16-28. These observations seem inconsistent with the attorney's professed involvement in the drafting of the complaints.

It also appears that Attorney Pomeranz made little effort to ensure that the factual contentions in the Complaints had evidentiary support. When asked at the first hearing what investigation she made into the merits of the case pursuant to Rule 11, Attorney Pomeranz responded: "I went with [Ms. Carton] to visit ***most*** of those establishments. I reviewed all of the ADA regulations and saw that the factual allegations and the photos we had showed lack of compliance; some minor, some major. But they all fell within the regulations for, per se, violations of the ADA." *Transcript* – 1st Hrg at 14:23–15:03 (emphasis added). But when asked if Attorney Pomeranz accompanied her on the visits, Ms. Carton responded: "I think there might have been ***one or two***. I don't really remember. I remember being on the phone with her, as well, so it might have been that we were on the phone. But, yeah, that's all I remember about that." *Transcript* – 2nd Hrg at 24:06-12 (emphasis added). Attorney Pomeranz maintained that prior to filing a complaint, it was up to Ms. Carton to provide her with "photos and measurements for each and complaint." *Transcript* – 1st Hrg at 42:24–43:01. And, Ms. Carton confirmed that her attorney never took any

measurements.  *Transcript –* 2nd Hrg at 24:13-15.

Attorney Pomeranz also made little effort, if any, to assure that Ms. Carton

agreed with the written allegations filed with the Court. When Ms. Carton was asked

whether she reviewed the Complaints before their filing, she responded:

> I think I might have, but in a very vague way.  Like I didn't see any
> papers.  I think there was just mention of it.  And so it was not
> something that I had in my mind in a very concrete – I didn't have a
> concrete picture of what was going on, because usually I need to be
> able to see something like we saw earlier with the photos.  As soon as I
> see a photo, "Oh, I recognize that person.  I know that person's name."
> So, you know, with these cases, you know, if I had seen the picture or
> seen the written version of what the cases looked like, you know, I
> would be able to – I'd have a better understanding of, you know, what
> was going on.

*Transcript –* 2nd Hrg at 116:17–117:05.  When asked if she specifically reviewed

Paragraph 31 of each Complaint to assure the accuracy of the list of particular barriers

she experienced at the location, Ms. Carton stated:

> Not -- not by looking at a paper.  Not by looking at the actual written
> document.  But I did talk to the team at the time and say, "Yes, I saw
> this."  I mean, we had pictures of, you know, the barriers, and I was
> aware of the pictures.  I went back to the locations and saw the barriers
> myself.  Somebody witnessed me going back to those, you know, all
> those locations so that, you know, everything was legit.  And so that's
> how that worked out.  But I didn't actually see a document at the time.

*Transcript –* 2nd Hrg at 117:12-22.

**V. Preparation of the IFP Applications**

Plaintiff portrays the preparation of the IFP applications as a joint effort between

Ms. Carton, Attorney Pomeranz and LMFS.  According to Attorney Pomeranz, she gave

the IFP affidavit to Ms. Carton, Ms. Carton gave information about her income to

Attorney Pomeranz, who had "her staff" put it into the form, and then "we all reviewed

it."  *Transcript –* 2nd Hrg at 72:20-25. Again, this portrayal rings hollow.

It was Emily@aid.org who, on November 1, 2016, sent an IFP application form for the District of **_Colorado_** to Ms. Carton for her to fill out. *Doc. 34* at 4-14. Evidently, once the form was typed out by LMFS staff, it was then sent to Ms. Carton for her signature. When asked whether she reviewed the IFP application before it was submitted, Ms. Carton responded: "I don't think so. I don't remember." *Transcript* – 2nd Hrg at 45:21-24. Thus, Ms. Carton's role in the filing of the IFP applications appears to be the result of willful ignorance at most.

Of greatest concern, the Court is troubled that Attorney Pomeranz and LMFS prepared and filed the IFP applications on Ms. Carton's behalf knowing, **_but failing to disclose_** to the Court, that Ms. Carton indeed had the ability to pay the filing fees through her agreement with LMFS. Before the filing of any of these cases, Ms. Carton executed an agreement providing that LMFS "shall pay the costs of pursing the Claims including . . . court fees." *Attachment A* at ¶ 2(c)(ii). Ms. Carton testified that she was under the mistaken belief that Attorney Pomeranz or her staff had disclosed to the Court this arrangement for LMFS to pay the filing fees when she applied for *in forma pauperis* status. *Transcript* – 2nd Hrg at 44:07–45:14. To the contrary, Attorney Pomeranz persisted in misrepresenting that due to her client's indigency, Ms. Carton "can't pay fees." *Transcript* – 2nd Hrg at 38:14-15.

One must then ask, why the unwillingness to share the source available to pay the filing fees? The answer lies in Ms. Carton's contract with LMFS:

> All discussions between Company [LMFS] with Claimant [Carton], Company with Claimant's attorney [Pomeranz], and any of Company's representative with any of Claimant's representatives, including the agreement are confidential and intended to remain confidential. Except as expressly permitted herein, **_The Parties agrees (sic) not to disclose the existence of this Agreement_**, any of its terms, or any

details learned while engaged with one another, to any person or entity not a party to this Agreement excepting the Parties' legal representatives. The Parties shall maintain in strict confidence any and all information disclosed. The parties agree that ***if asked directly, the Parties may state that they entered into a confidential agreement for litigation support.***

*Attachment A* at ¶ 5(a). If this "litigation funding model" passes ethical muster, why the need for secrecy of its existence, much less its terms?

At least one reason is evident here – the company's attempt to evade its contractual obligation to pay the court's filing fees by relying on a claimant's indigency in order to qualify for *in forma pauperis* status. Attorney Pomeranz and LMFS agreed that LMFS would "pay the filing fee unless waived." *Attachment C* at ¶ 3(l). It is apparent that both Attorney Pomeranz and LMFS misapprehend the applicable law, however; that is, the filing fee is ***not waivable***. Instead, the Court may simply permit a litigant to proceed without ***pre-payment*** of the filing fee if the plaintiff is indigent.[3] Indeed, at the first hearing Attorney Pomeranz suggested that the only remaining obligation of her client was to periodically update the Court on her income. *Transcript* – 1st Hrg at 12:08–13:11. She also seemed confused when the Court informed her that her client remains obligated to pay the almost $40,000 in filing fees for the 99 cases.

Yet the Court expressly notified Ms. Pomeranz and her client months earlier that the filing fees cannot be waived:

> Plaintiff is obligated to pay the fee for instituting each of the civil actions listed above, including those cases where the Court is allowing Plaintiff to proceed *in forma pauperis* pursuant to 28 U.S.C. 1915.   Section 1915(a) does not permit litigants to avoid payment of fees; only prepayment of fees may be excused.  *See Brown v. Eppler*, 725 F.3d

---

[3]   A plain reading of the relevant statutes establishes that the filing fee is not waivable. *See* 28 U.S.C. § 1914 (the "clerk of each district court shall require the parties instituting any civil suit or proceeding in such court . . . to pay a filing fee of $350");  28 U.S.C. § 1915(a) (the Court "may authorize the commencement . . . of any suit, action or proceeding, civil or criminal . . . without prepayment of fees").

> 1221, 1331 (10th Cir. 2013) ("all § 1915(a) does for any litigant is excuse the *pre*-payment of fees"). The fee for instituting any civil action, suit or proceeding in this Court is $400.00, which is comprised of the $350.00 filing fee, *see* 28 U.S.C. 1914(a), and a $50.00 administrative fee. Plaintiff is therefore obligated to pay the Court [$24,000.00] in fees for instituting the [60] cases listed above.

Doc. 4 at 4, filed February 3, 2017. Despite this notification that the filing fees are not waivable, an additional 39 cases and applications to proceed IFP were filed.

The Court further finds disingenuous Attorney Pomeranz' assertion that she did not believe it was necessary to disclose the funding agreement to the Court because she understood that IFP was based solely on Ms. Carton's income. *See Transcript –* 2nd Hrg at 83:08-86:10. The Affidavit in Support of the IFP Application is information provided "under penalty of perjury" in which Ms. Carton declares that she is "unable to pay the costs of these proceedings" and "entitled to the relief requested." Doc. 2 at 1. This statement is simply untrue, and Attorney Pomeranz knew that to be the case – Ms. Carton was able to pay the costs of these proceedings by virtue of her undisclosed agreement with LMFS. *Transcript –* 2nd Hrg at 65:13-21. More likely, the reason Attorney Pomeranz did not disclose the source of funds was her fear of being held in breach of contract if she revealed the existence of an agreement for LMFS to pay the Court's filing fees.

Attorney Pomeranz also flatly denied any knowledge of her client's receipt of any payments from an outside group in connection with these lawsuits:

> So as far as I know, she's not getting paid for these cases. Not by me. If she's working for somebody else, that has not been disclosed to me or brought to my attention. I know the news said that she was. I'm not sure where that information came from or -- she retained me to represent her in these ADA cases. And, you know, if it turns out that she's being paid by an organization outside the scope of our representation, that would be an issue for me, as well.

*Transcript* – 1st Hrg at 14:03-12. However, the record reveals that Attorney Pomeranz indeed knew that LMFS had provided money to Ms. Carton, but she chose to characterize it not as "payments" but as "advanced costs." As Attorney Pomeranz described it, LMFS

> had to pay Ms. -- the theory with the money that Ms. Carton received was that she would then use that money to buy goods and services. That was the model. Because I wanted to make sure she had standing, and it's a requirement that you intend to buy things, and she didn't have the money to buy things. That was the intention of her payment. It was not to pay her to litigate. And she answered that question. So there was that expense of her actually purchasing goods and services if she chose to.

*Transcript* – 2nd Hrg at 88:25–89:09. Ms. Carton's agreement with LMFS attempts the same distinction – "Company shall pay to Claimant $50.00 for each of Claimant's claims that result in a filed complaint initiating a civil action. This advance of costs is not required to be repaid to Company and is to be kept by Claimant regardless of the outcome of the action." *Attachment A* at ¶ 2(c)(iii). Yet the agreement imposes no obligation for Ms. Carton to use the funds in the purchase of services or products from the business that she has sued. Thus, the Court finds this characterization of a $50/case payment to Ms. Carton to be "a distinction without a difference" and finds Plaintiff's continued refusal to admit such payments to be in bad faith.

## VI. Attempts at Alternative Dispute Resolution

### A. Lack of Pre-Filing Attempts

Attorney Pomeranz, not Ms. Carton, made the decision to file the lawsuits before attempting to contact Defendants informally to remedy the alleged violations. Ms. Carton told her attorney or her attorney's "staff" that she wanted them to talk to

businesses if she found a problem and ask them to fix it prior to filing a lawsuit. *See Transcript –* 2nd Hrg at 28:19-22, 29:07-10. Ms. Carton thinks Attorney Pomeranz and her staff discouraged her from this approach but had initially agreed to it. *See Transcript –* 2nd Hrg at 28:19–29:10. Ms. Carton stated that

> it sounded like there was going to be a point where there were letters sent to them so that they would know we were coming or something like that, or what we felt, and that, you know, that was going to be taken care of by the team of people that was involved in it. And that just didn't happen.

*Transcript –* 2nd Hrg at 29:11-16.

Indeed, Ms. Carton insisted that: "it was not my idea to file the lawsuit first."

*Transcript –* 2nd Hrg at 29:23–30:01. Ms. Carton was asked again, "Why didn't you simply write to them and request remediation before filing your lawsuits?" She explained:

> there was a point where I talked to the team that was available to me at the time. I mentioned I thought that was a good idea, and it sounded like they were going to do that. And then when I found out that they didn't do that, I knew there was going to be a problem, so I suggested it, but I did not do that myself. That's where I went wrong.

*Transcript –* 2nd Hrg at 107:06-12. Ms. Carton told Attorney Pomeranz "that people are going to be upset" with her attorney's strategy. *Transcript –* 2nd Hrg at 108:04-07.

In fact, an ADA regulation encourages, but does not require, the use of alternative means of dispute resolution:

> Where appropriate and to the extent authorized by law, the use of alternative means of dispute resolution, including settlement negotiations, conciliation, facilitation, mediation, fact-finding, minitrials, and arbitration, is encouraged to resolve disputes arising under the Act and this part.

28 C.F.R. § 36.506. When asked if she was aware of this regulation in the ADA

encouraging alternative dispute resolution, Attorney Pomeranz responded:

> Well, there is no requirement. I know [Ms. Carton] and I discussed writing letters to the businesses first and trying to discuss with them remediation, and [Ms. Carton] said she had written many, many letters and they just go in the garbage, and that she had approached many of the business owners in the past and nothing would change, and she wanted to enforce her individual right to be a plaintiff in the ADA, which is statutorily provided for.

*Transcript* – 1st Hrg at 15:06-14. When Attorney Pomeranz was again asked why she failed to contact any of the Defendants and offer them an opportunity to remedy any violation before filing suit, she responded:

> It's not a requirement of the ADA. . . . It was a professional choice. I thought we would be more successful. It was a judgment call. . . . we had discussed that as a strategy, and [Ms. Carton] said she had done that in the past and it hadn't worked, that the businesses ignored her, and she wanted to do something with more import. She wanted to – she talked to the Attorney General, as well. She felt that she had advocated, and it had come to this.

*Transcript* – 1st Hrg at 43:10-14, 44:01-07.

### B. Post-filing Alternative Dispute Resolution

Ms. Carton has not been involved in any of the settlement activities after filing the lawsuits. In her agreement with LMFS, Ms. Carton affirmed that she had a "full and lengthy opportunity to discuss with" LMFS "the options for and likelihood of settlement" of her claims, and, therefore, gave LMFS "full and complete authorization to negotiate and accept any settlements of claims." *Attachment A* at ¶ 7(a) & (b). Ms. Carton also agreed to "cooperate and consent to any settlement" deemed reasonable by LMFS. Ms. Carton entered into that agreement on November 1, 2016, and the first of her cases was filed on January 13, 2017.

Attorney Pomeranz stated that she and/or LMFS attempted to settle each case

after it was filed:

> All of them we tried to settle.  Every single case, as soon as it was filed, each person was contacted to try to remediate and settle immediately to fix the violation.  They were all sent letters saying, "Please fix the violation.  That is our goal."
> . . . .
> They all had a small demand to cover the fees that we – our litigation costs.  Very small amounts.

*Transcript* – 1st Hrg at 44:17–45:10. Defendants' counsel disagreed with this contention.

When asked whether she was made aware of the settlement demands that were presented to Defendants by Attorney Pomeranz or LMFS, Ms. Carton stated:  "No, I was not made aware of that.  I mean, I might have heard something, but it didn't – I wasn't sure if that was accurate, and I didn't talk to her, talk to Sharon about that." *Transcript* – 2nd Hrg at 117:23–118:05.  Ms. Carton stated she never gave authority for those offers and, after being asked if she was aware of how much the offers were for, stated she was "not aware of the financial aspect of these cases."  *Transcript* – 2nd Hrg at 118:06-12.

## VII.  Standing

Paragraph 9 of all the Complaints allege that Ms. Carton "is a customer of Defendant and visited Defendant's PPA . . . to enjoy the goods and services offered at the PPA." In fact, Ms. Carton qualified that allegation in her testimony. Sometimes she went to Defendants' PPAs only as a tester, not as a customer seeking goods or services. *Transcript* – 2nd Hrg at 20:09-20, 25:12-18 (admitted she visited solely as a tester at Jeep dealership, daycare center, men's barbershop). Thus, these allegations in some of the Complaints about being a customer are simply untrue.

Moreover, it appears to the Court that Attorney Pomeranz and LMFS tried to

manufacture "customer" standing for Ms. Carton when they characterized the $50 payments to her as "advanced costs" if she wished to purchase goods or services from the PPAs against which she filed suit. As Attorney Pomeranz indicated:

> I wanted to make sure she had standing, and it's a requirement that you intend to buy things, and she didn't have the money to buy things. That was the intention of her payment. . . . So there was that expense of her actually purchasing goods and services if she chose to.

*Transcript* – 2nd Hrg at 89:03-09. There was no testimony, however, that Ms. Carton actually spent her own money or those "advanced costs" for goods and services at the sued PPAs or planned to do so in the future.

The Complaints also allege that Ms. Carton "acted as a tester for purposes of discovering, encountering, and engaging discrimination against persons with disabilities at Defendant's PPA." Complaint ¶ 11 (citing *Tandy v. City of Wichita*, 380 F.3d 1277, 1285-86 (10th Cir. 2004)). In *Tandy*, the Tenth Circuit held that "testers have standing to sue under Title II of the ADA" as long as they "satisfy the constitutional requirements of Article III." *Tandy*, 38 F.3d at 1287.

> To establish Article III standing, a plaintiff must show that: (1) she has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by the relief requested.

> The "injury in fact" requirement is satisfied differently depending on whether the plaintiff seeks prospective or retrospective relief. To seek prospective relief, the plaintiff must be suffering a continuing injury or be under a real and immediate threat of being injured in the future. Past wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury. The threatened injury must be "certainly impending" and not merely speculative. A claimed injury that is contingent upon speculation or conjecture is beyond the bounds of a federal court's jurisdiction. A plaintiff seeking retrospective relief, on the other hand, satisfies the "injury in fact" requirement if she suffered a

past injury that is concrete and particularized.

*Id.* at 1283-84 (citations omitted).

The Tenth Circuit extended *Tandy's* holding to testers, like Ms. Carton, who sue under Title III of the ADA. *See Colorado Cross Disability Coalition v. Abercrombie & Fitch Co.*, 765 F.3d 1205, 1211 (10th Cir. 2014). The *Colorado Cross* opinion expressly reemphasized that "[w]hen prospective relief – such as an injunction – is sought, the plaintiff ***must be suffering a continuing injury or be under a real and immediate threat of being injured in the future***." *Id.* at 1211 (emphasis added). Therefore, an ADA plaintiff seeking injunctive relief, like Ms. Carton, must have "a concrete, present plan to use" a facility that has caused her injury. *Id.* A vague intent to someday return to the place of injury is insufficient to confer standing. *Id.*

Aware of this requirement for standing, all of the Complaints at Paragraph 11 allege that "Plaintiff intends to visit the PPA regularly to verify compliance or non-compliance with the ADA" and "will suffer a real and imminent threat of encountering Defendant's accessibility barriers in the near future." Yet Ms. Carton testified that she thought she might have intended to later visit most or all of Defendants' PPAs, but that she really "didn't have a concrete plan" for returning to those PPAs. *Transcript* – 2nd Hrg at 25:23–26:16. Consequently, Ms. Carton fails to establish standing as a tester for any of the Complaints.

## VII. The LMFS Litigation Funding Model

Ms. Carton testified that in addition to effectuating compliance with ADA, she expected to receive money when cases settled. *Transcript* – 2nd Hrg at 13:07-09 ("if settlements happened, you know, that I would receive funds from something like that").

Looking carefully at her contracts with LMFS and Attorney Pomeranz, this appears not to be the case.

The LMFS agreement provides that "Claimant shall be entitled to all remaining proceeds" of any award or settlement after deduction of "all costs which Company has already occurred and any costs which it has yet to pay in accordance with this Agreement." *Attachment A* at ¶ 3(a) & (b). The agreement with LMFS further provides, however, "[t]his agreement, including this section discussing the distribution of Proceeds, shall not supersede any promise of payment made between Claimant and his/her attorney." *Attachment A* at ¶ 3(c). And, in Ms. Carton's Fee Agreement with her attorney, she specifically gives up any such proceeds:

> **Attorney shall receive an amount equal to one-hundred per cent (100%) of the Monetary Recovery** if affected by settlement before or after service of suit, with or without trial or if said monetary recovery is an award of the Court. Client understands and affirmatively acknowledges that the **Attorney's receipt(s) of all proceeds from monetary recoveries are calculated to reasonably compensate Attorney, staff, and support companies for the risk, burden, expense legal work and services necessary to Clients cases.**

*Attachment B* at 2-3 (emphasis added).

Thus, as in a carnival shell game, Ms. Carton's expectation for receiving any settlement proceeds was illusory. So just how did this "litigation funding model" with LMFS work?

● Ms. Carton was paid $50 by LMFS for each filed ADA case.

● Attorney Pomeranz was paid $100 by LMFS for each filed ADA case.

● LMFS provided Attorney Pomeranz with all "staff work" and costs – including creation of a website, receptionist, telephone, e-mail, a driver, paralegal and consulting services by LMFS attorneys – and was to be reimbursed for such expenses out of any recovery.[4]

---

[4] LMFS played such an extensive role in these cases that it virtually ran the litigation from start to finish.

● After reimbursement for the "staff work" and all costs, Attorney Pomeranz alone was to receive remainder of the recovery as additional compensation for her legal services.[5]

---

As the contract with Attorney Pomeranz set outs in Paragraph 3:

[LMFS] shall manage all aspects of ADA civil actions. The Company shall:
a. Design, pay for and maintain Pre-Filing Due Diligence Software ("DD Software") for the use of the Tester and Tester's assistant; and
b. Develop, pay for and maintain Case Management Software specifically designed for ADA Actions; and
c. Design, pay for and maintain a secure file sharing and storage location, such as dropbox, accessible to the Company, Attorney and Tester; and
d. Hire, retain, and/or train employees with expertise in ADA litigation including, but not limited to, paralegals, secretaries, inspectors, and attorneys licensed to practice in a Federal District Court.
e. Aid Tester and Tester's assistant to investigate and document ADA violations in public accommodations with the use of DD Software; and
f. Based on DD software and ownership / control investigation, prepare a Due Diligence Report ("DDR") and file same in the dropbox; and
g. Contact Tester directly for the purpose of preparing and submitting Motion to Proceed in Forma Pauperis pursuant to 28 U.S.C. § 1915 and to complete the Affidavit; and
h. On the basis of the DDR, prepare a (1) draft Verified Complaint which shall generally describe the ADA violations and append as Exhibit A the DDR for specific violations, (2) draft Motion to Proceed in Forma Pauperis, (3) draft Summons(es), (4) draft Civil Action Coversheet(s), and (5) other standard documents required to be filed in the Jurisdiction (cumulatively "Initial Court Documents") and save the same in the Dropbox; and
i. Conduct a review of Initial Court Documents by Company; and
j. Invite Attorney and Tester to review and approve / disapprove the draft documents for filing; and
k. Upon Attorney's approval of the Initial Court Documents, file the same with the US District Court; and
l. Pay the filing fee unless waived; and
m. Serve Defendants and pay for service of process; and
n. Conduct settlement discussions and:
        i. Settle Cases, or
        ii. Litigate cases under the direction of Attorney including drafting and filing a motion for preliminary injunction, motion for default judgment, motions for judgment on the pleadings, motion for summary judgment, and responses to Defendant(s)' motions.
o. Prepare closing documents for approval by Attorney.

[5] By contrast, Attorney Pomeranz' contributions to the litigation were minimal, *Attachment C* at ¶ 4 with emphasis added below:

a. Contact the US District Court in which ADA enforcement actions are to be filed, and ensure that the Clerk's PACER distribution e-mails contain both Attorney's primary e-mail and paralegal's secondary e-mail.
b. Review, approve (or disapprove) Initial Court Documents and any subsequent work papers; and
c. Authorize Company in writing to file Initial Court Documents over Attorney's electronic signature; and

Based upon all the above observations, I recommend that the Court dismiss these cases with prejudice as malicious because they were primarily filed for an improper purpose. It appears that Attorney Pomeranz and LMFS are using the judicial process to harass Defendants into settlements to obtain financial gain for Attorney Pomeranz and LMFS and not to remedy ADA violations that served as barriers to individuals with disabilities in accessing goods and services.

One of the most troubling indicators is that Attorney Pomeranz disregarded Ms. Carton's wish that Defendants be contacted informally and given the opportunity to remedy any violations prior to filing the lawsuits. If obtaining remediation was truly the goal of the "litigation team," an attempt at achieving voluntary compliance as proposed by Ms. Carton would seem the logical first step. Usually it will be far less costly for a PPA to voluntarily remedy an ADA violation than to defend a lawsuit, especially for the adjustment of the height of a parking sign or width of a designated parking space.

Instead, with minimal effort Attorney Pomeranz and/or LMFS prepared and filed 99 boilerplate Complaints – the only differences being the Defendant's name, the address of each PPA, and a single paragraph identifying with particularity the alleged ADA violations at that PPA. Moreover, the Court commented that as to the only "unique" features of each Complaint – the name of the PPA, address and location – there were many misspellings. As noted above, some of the allegations going to Ms. Carton's status as a "customer" or "tester" were untrue. At the hearings, several

---

d. Regularly review all Actions in the secure file sharing and storage location; and
e. In those cases where Attorney handles negotiations and litigation, *if any*, maintain the current status of the case in a secure file sharing and storage location for review by Company and Tester; and
f. Receive settlement amounts, if any, and distribute same as indicated below.

Defendant PPAs also asserted the falsity of many alleged ADA violations and many contended that suits had been filed against Defendants with no ownership interest or control over the facility at issue.

In her testimony, Ms. Carton indicated that her attorney gave her "a list" of ADA regulations including "basic things about, you know, soap dispenser height and paper towel dispenser height and countertop height and things of that nature" – so that Ms. Carton "would know what [she] was doing" when she visited a business. *Transcript* – 2nd Hrg at 60:04-12. Ms. Carton admitted that she did not explore whether there was an actual barrier to entering a PPA building where she or her driver had identified a technical "parking lot signage" claim. *Transcript* – 2nd Hrg at 126:06-11.

Taken together, these circumstances indicate that the Court was misled into believing that Plaintiff Carton lacked the resources to pay the required filing fees and that these cases were filed in bad faith primarily for the purpose of coercing settlements. Indeed, LMFS expressly required that Ms. Carton "give[] Company ***full and complete authorization to negotiate and accept any settlements*** of Claims" and "agree[] to cooperate and consent to any settlement deemed reasonbly (sic) by Company." *Attachment A* at ¶ 7(b). Further, Ms. Carton was required "to direct his/her attorney to settle Claims as directed by Company if so directed." *Attachment A* at ¶ 7(c).

In addressing similar cases in other jurisdictions, some courts have described what has been called the growth of a "cottage industry" – a law firm or other entity that encourages "serial" plaintiffs to seek out technical violations of ADA regulations and then immediately file suit to coerce settlements from the allegedly infringing business:

> Although the ADA's private remedies are limited to injunctive relief, *id.*
> § 12188(a), the ADA, nevertheless, contains an incentive to private

litigation – an attorney's fee provision.

This statutory scheme has resulted in an explosion of private ADA-related litigation . . . . filed by a relatively small number of plaintiffs (and their counsel) who have assumed the role of private attorneys general. This lawsuit is a case in point. Here, suit was filed less than a week after Plaintiff's counsel verified the ADA deficiencies. There was no effort to communicate with the property owner to encourage voluntary compliance, no warning and no offer to forbear during a reasonable period of time while remedial measures are taken.

Why would an individual like Plaintiff be in such a rush to file suit when only injunctive relief is available? Wouldn't conciliation and voluntary compliance be a more rational solution? Of course it would, but pre-suit settlements do not vest plaintiffs' counsel with an entitlement to attorney's fees. *Buckhannon Bd. and Care Home, Inc., v. West Virginia Dept. of Health and Human Resources,* 532 U.S. 598, 605, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001). Moreover, if a plaintiff forebears and attempts pre-litigation resolution, someone else may come along and sue first. The current ADA lawsuit binge is, therefore, essentially driven by economics – that is, the economics of attorney's fees.

*Rodriguez v. Investco, L.L.C.*, 305 F. Supp. 2d 1278, 1281-82 (M.D. Fla. 2004); *see also Molski v. Mandarin Touch Rest.*, 347 F. Supp. 2d 860, 863 (C.D. Cal. 2004), *aff'd in part, dismissed in part sub nom. Molski v. Evergreen Dynasty Corp.*, 500 F.3d 1047 (9th Cir. 2007).

One unfortunate effect of the above practice is evident here: the hostility of businesses forced into an expensive settlement rather than receiving a less expensive opportunity to demonstrate compliance with ADA dictates or to voluntarily  meet an ADA obligation. As Ms. Carton now realizes,  "[t]his type of shotgun litigation undermines both the spirit and purpose of the ADA." *See Steven Brother v. Tiger Partner, LLC*, 331 F. Supp. 2d 1368, 1375 (M.D. Fla. 2004).

### Recommendation

The Court therefore proposes that the remaining pending actions, listed below,

be dismissed as malicious pursuant to 28 U.S.C. § 1915(e)(2). The Court also recommends that the cases be dismissed with prejudice as both Ms. Carton and Attorney Pomeranz have requested. *See Transcript –*2nd Hrg at 94:12–95:05. With the dismissal of the cases, the full amount of remaining court filing fees for these cases will be due for payment to the Clerk of Court.

Finally, some Defendants have requested that dismissal be conditioned on the payment of attorney fees and costs in defending these actions and potentially sanctions. Some other Defendants indicated that they have filed, or intend to file, a counterclaim for malicious abuse of process. Those issues were not referred to me by Chief Judge Armijo and are therefore not addressed herein.

Nonetheless, I recommend that the Court retain jurisdiction for addressing such requests and impose a deadline for Defendants to file those motions. Any such motions should identify the person(s) or entity against which fees and costs are sought, the amount sought, an affidavit in support of the request, and a memorandum brief with case law in support of the request. If Chief Judge Armijo agrees with this recommendation, the Court proposes that such motions and memoranda be filed in the individual case in which the defendant has been sued and that a notice of such filing be directed to my chambers staff at [molzenchambers@nmcourt.fed.us](mailto:molzenchambers@nmcourt.fed.us).

**IT IS ALSO ORDERED** that the Clerk of the Court file this Proposed Findings of Fact and Recommended Disposition in each of the following cases:

| | |
|---|---|
| 1:17-cv-00037-KG-SCY | Carton v. Carroll Ventures Inc. |
| 1:17-cv-00038-KBM-WPL | Carton v. Cole MT Albuquerque (San Mateo) NM LLC |
| 1:17-cv-00039-SCY-LF | Carton v. Courtyard NM LLC |
| 1:17-cv-00040-KK-SCY | Carton v. HDY LLC |

| | |
|---|---|
| 1:17-cv-00041-SCY-WPL | Carton v. Roshni |
| 1:17-cv-00043-SCY-KBM | Carton v. Laxmi Management LLC |
| 1:17-cv-00044-LF-KK | Carton v. LBC Company, LLC |
| 1:17-cv-00046-SCY-KBM | Carton v. San Mateo/Indian School, Inc. |
| 1:17-cv-00047-KK-WPL | Carton v. Spilca Nicolae & Mariana |
| 1:17-cv-00048-WPL-SCY | Carton v. Spirit Master Funding, LLC |
| 1:17-cv-00058-SCY-KK | Carton v. Autozone Stores LLC |
| 1:17-cv-00063-WPL-SCY | Carton v. Cole AB Albuquerque NM, LLC |
| 1:17-cv-00073-WPL-SCY | Carton v. Market Center East Retail Property, Inc. |
| 1:17-cv-00075-WPL-CG | Carton v. Miller Family Real Estate, LLC |
| 1:17-cv-00077-KK-WPL | Carton v. Pacific Realty, CO |
| 1:17-cv-00078-WPL-LF | Carton v. Q Market Center, LLC |
| 1:17-cv-00080-LF-KK | Carton v. Realty Income, Corporation |
| 1:17-cv-00082-KK-KBM | Carton v. Brunetto et al |
| 1:17-cv-00083-LF-WPL | Carton v. Southwest Capital Projects, LLC |
| 1:17-cv-00084-SCY-KBM | Carton v. Westland Properties, LLC |
| 1:17-cv-00085-GJF-KBM | Carton v. Zia Trust, Inc. |
| 1:17-cv-00153-WPL-KK | Carton v. B+H Investments, LLC |
| 1:17-cv-00154-GBW-KK | Carton v. Fair Plaza, Inc |
| 1:17-cv-00156-SCY-LF | Carton v. Hayman Nurseries, LLC |
| 1:17-cv-00159-SMV-LF | Carton v. Kawips New Mexico, LLC |
| 1:17-cv-00160-GJF-LF | Carton v. LNU, et al |
| 1:17-cv-00161-LF-KBM | Carton v. M & E New Mexico Property, LLC |
| 1:17-cv-00162-WPL-LF | Carton v. Monarch Land, LLC |
| 1:17-cv-00163-KK-WPL | Carton v. Montgomery-Juan Tabo Properties, LLC |
| 1:17-cv-00164-SCY-WPL | Carton v. New Mexico Bank & Trust |
| 1:17-cv-00165-WPL-LF | Carton v. Pacific Bistro Partnership |
| 1:17-cv-00166-KBM-KK | Carton v. Pizza Hut of America LLC |
| 1:17-cv-00167-SCY-LF | Carton v. Jaramillo, et al |
| 1:17-cv-00170-KBM-KK | Carton v. Starlight Investments, LLC |
| 1:17-cv-00173-RB-SCY | Carton v. Three J's, Limited Partnership |

| | |
|---|---|
| 1:17-cv-00174-KK-KBM | Carton v. Tulsi Group, LLC |
| 1:17-cv-00211-WPL-GJF | Carton v. Autozone Stores, LLC |
| 1:17-cv-00215-KK-KBM | Carton v. Circle K Stores, Inc. |
| 1:17-cv-00218-KBM-LF | Carton v. Circle K Stores, Inc. |
| 1:17-cv-00223-SCY-KK | Carton v. M & S Properties, LLC |
| 1:17-cv-00224-KK-LF | Carton v. Medlock-New Mexico Properties, LLC |
| 1:17-cv-00225-KBM-KK | Carton v. Ling, et al. |
| 1:17-cv-00227-KBM-WPL | Carton v. Tachung Investment Company |
| 1:17-cv-00228-LF-KK | Carton v. Up Your Alley, LLC |
| 1:17-cv-00229-KK-KBM | Carton v. Wells Fargo Bank New Mexico N A |
| 1:17-cv-00293-SCY-WPL | Carton v. 9613, LLC |
| 1:17-cv-00294-SCY-LF | Carton v. Albertson's LLC |
| 1:17-cv-00295-LF-KBM | Carton v. Amerco Real Estate Company |
| 1:17-cv-00297-SCY-KK | Carton v. Conquistadores, Inc. |
| 1:17-cv-00298-SCY-KK | Carton v. D.W. Investments, Inc. |
| 1:17-cv-00299-LF-SCY | Carton v. LNU et al |
| 1:17-cv-00300-KK-WPL | Carton v. Zhao et al |
| 1:17-cv-00301-KK-WPL | Carton v. Eubank 3801, LLC |
| 1:17-cv-00302-KBM-KK | Carton v. Family Medicine, P.C. |
| 1:17-cv-00303-LF-KBM | Carton v. Fu Yuang, LLC |
| 1:17-cv-00304-LF-CG | Carton v. LNU, et al. |
| 1:17-cv-00305-KK-SCY | Carton v. LNU |
| 1:17-cv-00306-KK-KBM | Carton v. LNU |
| 1:17-cv-00308-KK-KBM | Carton v. Masada Limited Company |
| 1:17-cv-00309-GJF-LF | Carton v. Palo Alto, Inc. |
| 1:17-cv-00310-LF-KBM | Carton v. Quality Jeep Limited Partnership |
| 1:17-cv-00311-SMV-KK | Carton v. Scottsdale Village, LLC |
| 1:17-cv-00313-LF-WPL | Carton v. Starbucks Coffee Company |
| 1:17-cv-00314-CG-SCY | Carton v. Trimari Holdings, LLC |
| 1:17-cv-00315-KK-KBM | Carton v. U.S. Bank National Association |

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition, they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1).

**A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition.  If no objections are filed, no appellate review will be allowed.**

_____
UNITED STATES CHIEF MAGISTRATE JUDGE